IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-00425-RBJ

TAMMI L. CHAMPLIN,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security Administration,

    Defendant.

## ORDER

    The Court here reviews the Commissioner's denial of Tammi L. Champlin's application for disability benefits under Titles II and XVI of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g).

**Facts**

Procedural Background

    On March 3, 2009 Ms. Champlin filed a Title II application for a period of disability and disability insurance benefits as well as a Title XVI application for supplemental security income. R. at 10. In both applications Ms. Champlin alleged a disability onset date of June 1, 2007. *Id.* Ms. Champlin met the insured status requirement through March 31, 2010. R. at 12. Accordingly, the issue is whether Ms. Champlin was disabled between June 1, 2007 and March 31, 2010 (the "relevant period").

    Ms. Champlin's applications were initially denied on July 15, 2009. She then requested a hearing before an Administrative Law Judge. The hearing was held via video conference, with

Ms. Champlin and her attorney appearing in Grand Junction, Colorado and the ALJ presiding over the hearing from Fargo, North Dakota. Kent Granat, a vocational expert ("VE"), appeared at the hearing by telephone. On January 24, 2011, ALJ Hallie Larson issued an unfavorable decision denying Ms. Champlin social security benefits. R. at 7. Ms. Champlin pursued an internal appeal and provided additional evidence (medical records from the Midwestern Colorado Mental Health Center dated October 26, 2011 through November 9, 2011 and from Dr. David Adkisson dated December 18, 2010) in addition to a legal brief. R. at 4. However the Appeals Council denied her request to review the ALJ's decision. R. at 1. The present case was filed on February 17, 2012.

<u>Ms. Champlin</u>

Ms. Champlin was born on September 4, 1967, making her 39 years old on the alleged onset date and 43 years old at the ALJ hearing. She completed three years of college. Her past relevant work included accounting clerk, general clerk and human resources clerk. R. at 202. She last worked on May 29, 2007 in a daycare center. R. at 56. She indicated that her job ended because she went into the hospital with gestational diabetes and possible preeclampsia. *Id.* She had a baby on July 17, 2007. She testified that she did not return to work after that because of her weight and back pain. R. at 57.

Ms. Champlin, who is five feet six inches tall, weighed approximately 245 pounds on the date of the hearing, January 7, 2011. R. at 55. However, she had lost 80 pounds between June 2007 and January 2011, due in part to surgery and in part to a reduced appetite. R. at 55-56. Her weight fluctuated between 285 pounds and 322 pounds during the relevant period. R. at 65.

Ms. Champlin described her medical problems as including degenerative disc disease with protruding discs, causing back pain that sometimes causes pain between her shoulder blades

2

and muscle spasms; occasional left knee pain from her kneecap rubbing against the joint (for which she had arthroscopic surgery that helped); left leg weakness that turns to numbness after standing for 15 minutes; and bipolar disorder. R. at 57-60, 63. At the time of the hearing she was taking Gabapentin and medical marijuana for back pain and Abilify for depression. R. at 57, 65.

In response to the ALJ's questions, Ms. Champlin testified that her doctor told her to avoid lifting more than 20 to 30 pounds and to avoid going up and down stairs because of her back and knee pain. R. at 58. She can walk approximately half a block and sit for approximately fifteen minutes. R. at 59. Her most comfortable position was lying down or reclining *Id.* Her bipolar disorder causes her to lack concentration and to cry a lot, and she is seeing a nurse practitioner named Carol for that. R. at 59-60. She says she spends her days reclining in a chair at home. R. at 60. However, she does the cooking, cleaning, laundry, sweeping, vacuuming, and grocery shopping. *Id.* She cares for her son's needs and her own personal needs. R. at 60-61. Her husband, who does not work outside the home, takes care of the yard and the four dogs. R. at 56, 61.

Ms. Champlin also told the ALJ that she has no hobbies. She testified that she used to like to bowl, but that she hasn't bowled for many years, since she lived in Arizona. That apparently would have been prior to 2005 when she moved to Colorado. R. at 61-62. She used to do needlepoint but doesn't anymore. R. at 61-62. She does spend about two hours a day at the computer, checking her e-mail, playing games and looking things up. R. at 62. She does not belong to social groups or do volunteer work. *Id.*

In response to questions from counsel, Ms. Champlin indicated that although she cooks dinner, it takes two hours, because she has to sit down about every 15 minutes. R. at 63-64. She

3

vacuums once a month and just the living room, which takes half an hour to an hour because she can't go very fast. R. at 64. She does the laundry every three weeks. *Id.* She uses an electric cart when she does the grocery shopping and has help loading and unloading the car. R. at 64-65. In addition to the medical problems she had mentioned, she indicated that she had asthma, which causes shortness of breath on any exertion. R. at 65. She said that she does not read, because she can't concentrate. R. at 66. She does not sleep well. *Id.* She cannot reach overhead with any strength. She said that her finger coordination is fine, but she can't work at a "typewriter" for any length of time because of back pain which affects her concentration. *Id.* at 66-67. She says that she has weak balance and has to grab something "all the time" to keep from falling. *Id.* at 67. She testified that she is manic and has extra energy maybe twice a month for a day at a time but otherwise is just depressed. *Id.* at 68.

    <u>Ms. Champlin's Medical History</u>

Ms. Champlin has seen several doctors in the past few years regarding her numerous afflictions. She began seeing Stan Adkisson, M.D. (an internal medicine specialist in Delta, Colorado), in 2005 and continued to see him through April 2009 when her Disability Report was completed for her disability benefits application and at least twice thereafter. R. 164, 384, 524. He frequently noted that she suffered from ailments such as obesity, asthma, hypertension, sciatica, restless leg syndrome, bipolar disorder, depression, sleep apnea, and back pain. R. at 230, 232–34, 385–87, 498, 524.

Ms. Champlin saw was Jacqueline Garrard, M.D. for a vaginal hysterectomy in February 2008. R. at 265. Dr. Garrard encountered some issues during the operation that forced her to convert the vaginal hysterectomy into a full abdominal hysterectomy. *Id.* Dr. Garrard's

4

discharge notes show that Ms. Champlin suffered from menometrorrhagia, chronic hypertension, asthma, sleep apnea, bipolar disorder, morbid obesity, and borderline diabetes mellitus. *Id.*

Ms. Champlin first visited David Good, M.D. (a psychiatrist) at the Midwestern Colorado Mental Health Center in Delta, Colorado on August 21, 2008. R. 164, 219. The medical records indicate that she saw him a total of 11 times between August 2008 and October 2009. R. at 213-19, 376-80. He diagnosed bipolar disorder, depressed phase, tried different medications, and noted minimal to some progress over the course of the visits. Each time he graded her risk level on a one to five scale as "no risk," although there is no key explaining what this means.

Ms. Champlin saw Steve Padua, M.D. in the emergency department at the Delta Memorial Hospital on September 19, 2008. Dr. Padua filled out an emergency physician report that appears to say that Ms. Champlin suffered a knee injury that required arthroscopy while bowling. R. at 293. The record also appears to indicate that the injury occurred three weeks earlier. R. at 295.

Douglas Huene, M.D., an orthopedic surgeon, performed a left knee arthroscopy with debridement on October 13, 2008. R. at 205. The records from two follow-up visits noted no complaints from Ms. Champlin. The wound was healing nicely, and there was no evidence of infection. R. at 203–04.

As indicated above, Ms. Champlin filed her disability application on March 3, 2009. Denise Eschenbaum, DDS disability examiner, referred her to Lynn Holliday, M.D., of Disability Examination Services, L.L.C. who saw her on June 27, 2009 for a consultative physical examination. R. 337. Dr. Holliday noted that her chief complaints were left leg numbness and left knee pain. *Id.* Dr. Holliday diagnosed her with left leg numbness, left knee

osteoarthritis, history of bipolar disorder, uncontrolled hypertension, and morbid obesity. R. at 343. Dr. Holliday provided a functional assessment in which she opined that

> [t]he number of hours [Ms. Champlin] should be able to stand and walk during a normal 8-hour workday is about 2 hours. The number of hours she should be able to sit during a normal 8-hour workday is 8 hours. . . . I would recommend that she be limited in lifting and carrying no more than 20 pounds. No postural limitations are recommended at this time. No manipulative limitations are recommended at this time. No visual, communicative, or workplace environmental limitations are recommended at this time.

*Id.*

On July 14, 2009, James F. Dyde, M.D. a DDS psychiatrist, filled out a form entitled "Psychiatric Review Technique." R. at 354. It indicates that he conducted an assessment for the period June 1, 2007 to July 13 2009, and that included a consultation with Ms. Champlin. R. at 354, 366. He indicated that she had an impairment, specifically "Bipolar DO, depressed," that was not severe and that was in remission. R. at 354, 357. His assessment was that this impairment did not cause any functional limitations on her activities of daily living; social functioning; maintaining concentration, persistence, or pace; or episodes of decompensation. R. at 364. He indicated that she was doing well on her psychiatric medications, had normal motor activity on gross exam, appropriate affect, euthymic (non-depressed) mood, no thought disorder, and no psychosis. He reported, based on Ms. Champlin's statements which he deemed to be "credible," that she usually starts her day between 8:00 and 10:00 a.m., gets herself in and out of bed, dresses herself, bathes herself without specified difficulty, drives, cooks, cleans, takes care of her son, runs errands, prepares meals, and rests in bed. She retires between midnight and 1:00 a.m. R. at 366.

On July 14, 2009, Ms. Eschenbaum filled out a Physical Residual Functional Capacity Assessment for Ms. Champlin. R. at 346-53. Ms. Eschenbaum determined that Ms. Champlin could occasionally lift twenty pounds, frequently lift ten pounds, stand (with normal breaks) at least two hours in an eight-hour workday, sit (with normal breaks) for about six hours in an eight-hour day, and pull or push for an unlimited time during the day. R. at 347. Ms. Eschenbaum said Ms. Champlin had no postural, visual, communicative, environmental, or manipulative limitations. R. at 348–50.

As indicated above, Ms. Champlin's disability claim was denied on July 15, 2009. At Ms. Champlin's next visit to her psychiatrist, Dr. Good, on August 10, 2009, she told him that her disability claim had been denied, attributing this to their not paying attention to her physical problem, i.e., numbness in her left leg. R. at 377. She asked Dr. Good to support her disability claim on the basis of her bipolar disorder. His record states, "I advised her that I did not feel we were at a point of declaring her disabled because of that. She clearly was unhappy with my answer." *Id.*

In late 2009 Dr. Huene, the orthopedic surgeon who performed the left knee arthroscopy, referred her to Wenshu Yu, M.D., a rheumatologist, for evaluation of joint pain, in particular right wrist pain. Dr. Yu saw her on December 10, 2009. R. at 455, 458. In the History section of his report, he states,

> She used to go bowling on a weekly basis. She noted more pain when she is bowling… She typically takes 5 aleve on a daily basis, typically after bowling and also uses vicodin pm for breakthrough pain. She thinks her wrist is worst after bowling. She has not restricted her bowling activity due to the wrist pain.

R. at 455. Dr. Yu also noted that Ms. Champlin suffered back pain, neurological deficits, insomnia, and bipolar disorder. R. at 457.

On March 31, 2010 (the last day of the relevant period) Ms. Champlin saw a nurse practitioner, Carol Ibach, APRN (Advanced Practice Registered Nurse) at the Mental Health Center in Delta. R. at 372-75. This is the "Carol" to whom Ms. Champlin referred in her testimony at the ALJ hearing. She indicated that she had previously seen Dr. Good, and she was there for a "second opinion." R. at 372. She noted that she had applied for disability benefits but had been denied. *Id.* She mentioned problems with medications; chronic pain related to three discs; left leg numbness; excessive cleaning; lack of sleep; racing thoughts; and episodes of depression. *Id.* She was diagnosed with bipolar disorder and depression. However, the diagnosis seems to have been done by Stacee Curry, M.A., not by nurse practitioner Ibach. R. at 374. No therapy was provided. The "Treatment Plan" states that "[o]besity is a grave concern" and indicates that she would begin taking Abilify, which "has the least chance of weight gain," for her mental health issues. R. at 375. She saw Ms. Ibach again on April 16, 2010, for bipolar disorder, chronic leg and back pain, and obesity. Among other things she reported increased stress from her husband's lack of a job. R. at 368. The treatment plan was to increase the Abilify. R. at 370.

On April 21, 2010 Ms. Champlin returned to Dr. Adkisson. She reported that she was not able to do much with her exercise and weight program because of sciatica. His assessment was "morbid obesity," and he indicated that she qualified for bariatric surgery. R. at 384. In May 2010 Ms. Champlin had another (the first being while pregnant in 2007) hernia repair, followed by debridement of necrotic tissue in May and June 2010, and then panniculectomy surgery on July 5, 2010. *See* R. at 415. The latter appears to be the surgery to which Ms. Champlin referred as a "tummy tuck" at the ALJ hearing. She subsequently received treatment, including surgical procedures, relating to cellulitis and post-surgical infection. R. at 399-415.

On December 9, 2010 Dr. Adkisson completed a "Medical Source Statement." R. 498. The copy in the record is incomplete, omitting the first of two pages. It is unclear who provided the form to him or why. He responded to one question on page two, namely, to identify Ms. Champlin's primary diagnoses: obesity, hypertension, asthma, depression, chronic low back pain, history of anemia, and gestational diabetes. Dr. Adkisson added, "I am not qualified to perform functional evaluation nor to quantify work capacity. Suggest referral to occupational or physical medicine specialist for this." *Id.*

The ALJ denied her disability claim on January 24, 2011. On July 7, 2011 Ms. Champlin visited Dr. Adkisson again, seeking a determination that she was unable to work. R. at 524. Dr. Adkisson noted as "subjective" findings that she was having difficulty losing weight and exercising. Objectively, he reported an "extremely obese female who is lucid and cooperative [and] [i]n no acute distress. His assessment was hypertension, obesity and mental illness. *Id.* His notes state, "I agree in general that she cannot work, but I am not qualified to fill out a form as to exactly how many minutes and how many pounds she is able to move, lift or exercise. She will need to see an occupational therapist for this." *Id.*

<u>Vocational Expert</u>

During the ALJ hearing, the ALJ posed the following hypothetical to Mr. Granat, the vocational expert:

> [P]lease assume an individual of claimant's younger age, high school education, past work experience as you have previously summarized who has the residual functional capacity to lift up to ten pounds frequently and twenty pounds occasionally, to sit and stand or walk about six hours each in an eight-hour day with normal breaks. The individual should never climb ladders, ropes or scaffolds and only occasionally climb stairs or ramps, balance, stoop, kneel, crouch or crawl. The individual is limited to understanding, remembering and carrying out short, simple instructions and interacting appropriately with coworkers and the general public on a brief and superficial basis.

R. at 70.

In response, Mr. Granat testified that such a claimant could not perform her three past relevant jobs that Ms. Champlin had had. *Id.* However, he expressed the opinion that such an individual could find and perform other work. For instance, she could work as: an office helper, with 600 positions open regionally and 51,000 nationally; an electronics worker, with 4,100 positions open regionally and 790,000 nationally; or dye attacher in the semi-conductor industry, with 3,100 positions open regionally and 612,000 nationally. *Id.*

The ALJ then posed a second hypothetical, which contained the same facts except that now the individual "needs an opportunity to alternate positions after thirty minutes and then can remain working in the next fixed position up to thirty minutes at a time and so on throughout an eight-hour day." R. at 71. The vocational expert did not change his answer. Such an individual would be able to work the same positions as the individual with the limitations of the first hypothetical. R. at 71.

<u>The ALJ's Decision</u>

The ALJ followed the five-step sequential evaluation process for determining whether Ms. Champlin was disabled. At step one, the ALJ found that Ms. Champlin was not engaged in substantial gainful activity during the relevant period. R. at 12.

At step two, the ALJ found that Ms. Champlin had "the following severe impairments: left knee osteoarthritis, degenerative disc disease, obesity, and bipolar disorder." *Id.* The ALJ found that these impairments were severe, "because they cause significant limitation in the Ms. Champlin's ability to perform basic work activities." *Id.* The ALJ noted that Ms. Champlin has also been diagnosed with MRSA (methicillin-resistant staphylococcus aureus), hypertension, and asthma. The ALJ did not consider the asthma and hypertension to be severe, because "the record

10

does not establish that they cause significant limitation in Ms. Champlin's ability to perform basic work activities." R. at 13. The ALJ found Ms. Champlin's MSRA was not severe, because it did not last for a period of at least 12 months. *Id.*

At step three, the ALJ found that "the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.*

At step four, the ALJ found the Ms. Champlin had

> the residual functional capacity to perform light work . . . with the following limitations: the claimant can lift up to 20 pounds occasionally and 10 pounds frequently; the claimant can sit, stand, or walk for 6 hours in an 8 hour workday with normal breaks; the claimant must be given the opportunity to alternate between sitting and standing positions every 30 minutes; the claimant cannot be required to climb ladders, ropes, or scaffolds; the claimant can occasionally climb ramps or stairs; she can occasionally balance, stoop, kneel, crouch, and/or crawl; the claimant is limited to understanding, remembering, and carrying out short, simple instructions; she is limited to brief, superficial interaction with the general public and coworkers.

R. at 14.

The ALJ indicated that she had considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. R. at 15. She cited Dr. Holliday's consultative physical examination of June 26, 2009 and Ms. Eschenbaum's RFC assessment, although she found them to be only "partially credible." R. at 17. She noted Dr. Good's opinions, including his refusal to declare her disabled. *Id.* She noted Dr. Dyde's opinion that her mental limitations were not severe and did not limit her activities of daily living, etc. *Id.* She noted that Dr. Adkisson had declined to provide an evaluation of Ms. Champlin's functional limitations. R. at 18. She commented that there were no medical opinions in the record showing a greater set of limitations than those listed in her RFC assessment. *Id.*

11

With respect to Ms. Champlin's testimony, the ALJ noted that "she had indicated that she cooks, cleans, does laundry, sweeps or vacuums, cares for her son, and shops for groceries, but indicated that all of these activities take her longer to accomplish due to her back and knee impairments." R. at 16. She further noted that she takes care of her personal needs, although bending over to put on socks is painful and uses the computer approximately two hours a day, but that she had stated that she no longer is able to bowl or cross-stitch. R. at 16.

Summing up her findings regarding Ms. Champlin's description of her problems, the ALJ stated:

> After careful consideration of all the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

R. at 16.

At step five, the ALJ concluded that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Ms. Champlin can perform." *Id.* In making this determination, the ALJ relied on the testimony of the vocational expert, Mr. Granat.

### Conclusions

Plaintiff argues that the ALJ failed to properly (1) evaluate the opinions of several of Ms. Champlin's treating physicians and nurse practitioner Ibach; (2) consider Ms. Champlin's subjective complaints of pain and fatigue and assess her credibility; and (3) assess her RFC.

**A. Treating Physicians and Nurse Practitioner Ibach**.

"Medical opinions are statements from physicians, psychologists and other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s),

12

including your symptoms, diagnoses and prognosis, what you can still do despite your impairment(s), and your physician and mental restrictions." 20 C.F.R. § 404.1527(a)(2). *See Mayberry v. Astrue*, 461 F. App'x 705, 709–10 (10th Cir. 2012); *Watkins v. Barnhart*, 350 P.3d 1297, 1300 (10th Cir. 2003). Medical opinions must be considered together with other relevant evidence. *Id.* at § 404.1527(b).

A treating physician's medical opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and diagnostic techniques" and is "not inconsistent with other substantial evidence in the record." 20 C.F.R. § 416.927(d)(2). *See Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). However, the physician must have had more than a fleeting relationship with the claimant. 20 C.F.R. § 416.902. *See Doyal v. Barnhart*, 331 F.3d 758, 762-63 (10th Cir. 2003).

    1. <u>Dr. Adkisson</u>.

Ms. Champlin complains that the ALJ did not discuss Dr. Adkisson's consistent notation that she is extremely obese and his opinions that her obesity contributes to other conditions such as sciatica, degenerative joint disease, back pain, sleep apnea and restless leg syndrome. Dr. Adkisson treated her over a period of years, and any "medical opinion" he expressed would be entitled to controlling weight.

In the first place, although the ALJ did not discuss Dr. Adkisson's specific diagnoses and treatment as such, her decision reflects that she was well aware of the medical issues for which he treated Ms. Champlin. She listed obesity as a "severe impairment" caused a significant limitation in Ms. Champlin's ability to perform basic work activities. R. at 12. Ms. Champlin's obesity and its effects are ubiquitous throughout the medical records, and the decision reflects that the ALJ was well aware of that. The ALJ also listed degenerative disc disease and left knee

13

osteoarthritis (and bipolar disorder) as "severe impairments" that significantly restricted her ability to work. *Id.*

An ALJ is not required to discuss every piece of evidence. The ALJ here indicated that she considered the entire record. Lower tribunals are taken at their word when they say they have considered a matter. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). Taking the ALJ's decision as a whole, I find no basis to conclude that the ALJ did not consider everything in Dr. Adkisson's records.

More importantly, however, Dr. Adkisson did not provide a "medical opinion" regarding what Ms. Champlin could still do despite her impairments or her physical or mental restrictions. On the contrary, as the ALJ noted, Dr. Adkisson declined to provide an evaluation of Ms. Champlin's functional limitations. He indicated that he was not qualified to do so. Plaintiff notes that when Ms. Champlin went back to Dr. Adkisson on July 7, 2011, seeking a determination that she was unable to work, his notes indicate that he agreed in general that she could not work. This visit occurred nearly six months <u>after</u> the ALJ's decision. Moreover, in the same note Dr. Adkisson once again indicated that he was not qualified to determine such things as how many minutes she can work or how many pounds she can life, and that she should see an occupation therapist for that. A physician's general opinion that someone can't work, without more, is not particularly helpful. The responsibility for deciding the ultimate issue of whether a claimant is "disabled" or "unable to work" is reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1). *See Mayberry,* 461 F. App'x. at 708.

The July 7, 2011 note was provided to the Appeals Council. However, the Appeals Council did not find it to be a basis to question the ALJ's decision. For the reasons set forth above, I agree.

2. Dr. Huene.

Plaintiff complains that the ALJ did not mention Dr. Huene's opinion that Ms. Champlin's obesity might have a lot to do with her knee problems. Frankly, common sense would tell one that morbid obesity is not good for one's knees. In any event, the ALJ was well aware of both the obesity and the knee issues, as noted above. Dr. Huene's role in the medical history was that he performed successful orthopedic surgery on Ms. Champlin's knee in October 2008. He expressed no opinion concerning her knee issues, either before or after the surgery, or other medical problems affected such issues as standing, sitting, lifting, mobility, etc. that are relevant to her ability to work.

Dr. Holliday.

She performed a consultative physical examination. Because she saw Ms. Champlin only one time, she would not be classified as a treating physician whose opinions would be entitled to controlling weight. *Doyal,* 331 F.3d at 763. Nevertheless, Ms. Champlin questions the fact that the ALJ found Dr. Holliday's opinion that she can only stand two hours in an eight-hour day "partially credible." R. at 17. The ALJ's conclusion hinged on her requirement that Ms. Champlin be given the opportunity to alternate between sitting and standing every 30 minutes. *Id.* at 14, 17. I agree that some clarification of this finding is appropriate. *See infra* at 19-20.

Dr. Yu.

Plaintiff also complains that the ALJ did not comment on Dr. Yu's opinions concerning Ms. Champlin's fatigue, insomnia, and back pain. To begin with, Dr. Yu's relationship with Ms. Champlin was largely if not entirely limited to his December 10, 2010 evaluation. His relationship with her appears to be "fleeting," and as such, would not receive controlling weight. *Doyal,* 331 F.3d at 763.

Dr. Yu saw Ms. Champlin on a referral from Dr. Huene. His notes indicate that he saw her for evaluation and management of wrist pain. He noted Ms. Champlin's subjective complaint of lower back pain, and he noted his impression that she had degenerative disc disease and joint disease with disc protrusions. The ALJ was well aware of that impairment. Dr. Yu noted that Ms. Champlin had complained, among other things, about "generalized fatigue" and "insomnia." Those notations do not reflect the exercise of medical judgment, nor did Dr. Yu express any medical opinion as to the effect of fatigue or insomnia on her ability to perform basic activities required for work.

The record contains relatively little evidence, in comparison to some of Ms. Champlin's other issues, about sleep apnea and insomnia. *See* Adkisson note that Ms. Champlin complained of sleep apnea, R. at 386; Garrard note that Ms. Champlin suffered from sleep apnea, R. at 265; Ibach note that Ms. Champlin complained of sleep disturbance, R. at 519; Good note that a symptom of Ms. Champlin's depression was insomnia, R. at 219; and Ms. Champlin's testimony that she had trouble sleeping. R. at 66. The ALJ said that she considered the entire record. That would include the brief references to the insomnia and fatigue issues. No health care professional suggested that these issues would interfere with or limit her ability to do such things as standing, sitting, lifting, even concentrating, that might be required for work.

<u>Dr. Good and Nurse Practitioner Ibach</u>

Ms. Champlin faults the ALJ for not discussing Dr. Good's and Nurse Practitioner Ibach's comments regarding sleep issues. As indicated, neither they nor any other medical professional expressed an opinion about the impact of her sleep or fatigue issues on what she could do in terms of activities relevant to having a job.

Significantly, the ALJ did note that Dr. Good, the psychiatrist whom Ms. Champlin saw at the Midwestern Colorado Mental Health Center, declined her request for support with her disability claim and specifically declined to declare her disabled. The ALJ was well aware of Ms. Champlin's bipolar disorder, which was the primary impairment for which Ms. Champlin was seeing Dr. Good and Ms. Ibach. Moreover, as indicated above, according to the medical record, the underlying diagnosis on which Ms. Ibach seems to have been relying was apparently performed by Stacee Curry, M.A. Neither Ms. Ibach nor Ms. Curry expressed any opinions regarding the effect of Ms. Champlin's condition on her ability to do the things that might be required by her work.

### B. The ALJ's Finding Regarding Ms. Champlin's Credibility.

Ms. Champlin next argues that the ALJ failed properly to assess Ms. Champlin's credibility and in doing so failed to properly consider Ms. Champlin's subjective complaints of pain and fatigue. Pl. Br. at 28. I do not know whether the ALJ improperly <u>assessed</u> her credibility or whether she failed adequately to <u>consider</u> her subjective symptoms. I do conclude, however, that the ALJ did not adequately <u>explain</u> her credibility finding.

An ALJ's credibility determinations, like those of any finder of fact, are entitled to substantial deference. Like other findings, however, a credibility determination must have support in the record. Thus, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Brown,* 838 F.2d 1125, 1133 (10th Cir. 1988). Likewise, the ALJ must consider "subjective pain testimony, and expressly reflect that consideration in the findings." *Id.* The ALJ may consider, among other things, the objective medical evidence, the claimant's treatment and medication history, measures the claimant has taken to alleviate her symptoms, her work history, her daily activities

17

and, of course, the claimant's statements about her impairments, her pain, and the effect of these things on her capacity to perform work. *See generally* 20 C.F.R. 404.1529(c).

The ALJ found that "Ms. Champlin's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment." R. at 16. Frankly, that does not make much sense. The RFC is based on the entire record, including the claimant's statements. In any event, the ALJ's conclusion was not linked to any particular evidence. It is, in the words of the *Huston* court, a conclusion in the guise of findings.

This is not to say that there is no evidence in the record that might case doubt on Ms. Champlin's credibility. It is only to say that the ALJ did not explain her finding other than in conclusory terms and did not attempt to link the finding to any specific evidence in the record. That is not enough. Therefore, I conclude that a remand is necessary so that the ALJ can make and express findings regarding credibility that are linked to specific evidence in the record that supports the finding.

### C. The ALJ's RFC Determination.

Finally Ms. Champlin argues that the ALJ did not properly assess her RFC. Because the case is being remanded for further findings, it is premature to address this issue now. However, it would be helpful to the Court in the event that it might be called upon further to consider this case if the ALJ could clarify the statement that Ms. Champlin has the residual functional capacity to "sit, stand, or walk for 6 hours in an 8 hour workday with normal breaks; the claimant must be given the opportunity to alternate between sitting and standing positions every 30 minutes," R. at 14, and if she deems it necessary, supplement the record with additional evidence.

Specifically,

- If the ALJ means that the opportunity to alternate positions every 30 minutes would enable Ms. Champlin to work a complete eight hour day including either (1) sitting for six of the hours or (2) standing or (3) walking for six of the hours, as the job might require, then can she point to evidence in the record that she believes supports this conclusion?

- If the ALJ means that the opportunity to alternate positions every 30 minutes would enable Ms. Champlin to work a complete eight hour day including either (1) sitting for six of the hours or (2) standing or walking for six of the hours, as the job might require, then can she point to evidence in the record that she believes supports this conclusion?

- If the ALJ did not mean either of those things, then what did she mean, and how does her finding square with the vocational expert's testimony which was based on a hypothetical that assumed that the claimant could "sit and stand or walk about six hours <u>each</u> in an eight-hour day"?  R. at 70 (emphasis added).

**Order**

The decision of the ALJ is reversed.  The case is remanded to the Commissioner for proceedings consistent with this order.

DATED this 28th day of January, 2013.

                                                  BY THE COURT:

                                                  _____
                                                  R. Brooke Jackson
                                                  United States District Judge